RANDALL S. GOULDING, Plaintiff-Appellee, v. AG-RE-CO, INC., *et al.*, Defendants (Harry Lowrance, d/b/a Ag-Re-Co, Inc., Defendant-Appellant).

First District (2nd Division)   No. 1—90—2984

Opinion filed August 4, 1992.

Robert P. Sheridan, of Chicago, for appellant.

Randall S. Goulding, of Chicago, appellee *pro se.*

JUSTICE SCARIANO delivered the opinion of the court:

I

On June 4, 1987, Randall S. Goulding (Goulding) filed a complaint against Ag-Re-Co, Inc., Alan Zech (Zech) and Harry Lowrance, d/b/a Ag-Re-Co, Inc. (Lowrance), sounding in breach of contract, account stated, and *quantum meruit*, in which he sought payment of attorney fees claimed to have been earned in setting up Ag-Re-Co, Inc., and in acting as the corporation's counsel.

All the parties to this suit were also involved as defendants in a class action filed as *Kennicott Ridge v. Ag-Re-Co, Inc.*, which was pending in the United States District Court for the Northern District of Illinois. Court approval of a settlement reached in that case was conditioned upon the parties' reaching a "global" settlement of all of the differences between them, including settlement of the instant case. Thereafter, a tentative settlement was reached between the parties in the case at bar whereby Goulding's malpractice insurance carrier, CNA, was to pay Lowrance $25,000 for the release of his claims against Goulding, and the settlement was subject to its making such payment; and Lowrance was to pay Goulding $40,000 for the release of his claims against Lowrance. These details were memorialized in letters dated February 20 and 21, 1990, from Fred Harbecke, one of Goulding's attorneys[1], to Robert Sheridan, Lowrance's attorney.

On September 14, 1987, Goulding took a voluntary dismissal of the case, believing that he and Lowrance had settled their differences. On March 15, 1988, however, Goulding reinstated his action on the basis that they had failed to effectuate the settlement. On August 11, 1988, a default order was entered against Lowrance on the grounds that he had failed to file a timely appearance, a timely answer and to comply with discovery. On September 9, 1988, Lowrance filed a motion to vacate the default order on the grounds that he had been misled by his counsel that his case was being diligently defended, when in fact it was not. The court granted this motion on September 13, 1988, and on October 13, 1988, Lowrance filed his answer.

Goulding then filed a number of notices to take depositions and for other discovery, none of which was complied with. He then proceeded to file a bevy of "Motion[s] for Entry of Default Judgment, for Sanctions and/or to Compel." The only consequence of these motions

---

[1]The record indicates that Harbecke was engaged by CNA to represent Goulding.

relevant to the proceedings at bar is a February 9, 1990, order striking Lowrance's answer and holding him in default. Goulding did not notify Lowrance of either his intention to present his motion to strike and for a default, the actual striking of Lowrance's answer, or the granting of the default order. At the same time and prior thereto, however, the parties were attempting to follow through on the details of the settlement as memorialized in Harbecke's February 20 and 21, 1990, letters to Sheridan. Tom Browne, another of Goulding's attorneys employed by CNA to represent him, had the responsibility of obtaining the $25,000 check from CNA, but Browne's efforts were allegedly hampered by Lowrance's lack of promptness in organizing the corporation which was to be the payee on CNA's check.

Sometime after February 9, 1990, the clerk of the circuit court notified Lowrance of the default order entered against him. On March 8, 1990, Lowrance filed a motion to vacate the order, and on that same day Harbecke sent Sheridan final, unsigned versions of the "Stipulated Settlement Agreement and the Joint and Mutual Release," drafted by Harbecke, requesting that the matter be set for closing on March 12, 1990. When Lowrance brought his receipt of the notice of the default order to Harbecke's attention, Harbecke told Lowrance that he would "direct Mr. Goulding to have the default vacated"; and on March 26, 1990, Goulding did in fact file such a motion. However, Lowrance never pursued his motion to vacate, relying on a statement alleged to have been made by Harbecke that Goulding's motion to vacate had been granted. But neither did Goulding present at any time his motion to vacate to the court; thus, the February 9, 1990 order of default was never vacated.

On April 4, 1990, Harbecke sent Sheridan a letter expressing his discontent that the settlement negotiations were not progressing, stating that Sheridan and his client had been uncooperative in attempting to settle, and suggesting that Goulding "may be correct in his assertion that no settlement will ultimately result." Harbecke ended the letter with the admonition that, "if we do not conclude this settlement on or before April 18, 1990, *** my client's offer be [*sic*] and is hereby withdrawn." By facsimile sent to Harbecke on April 23, 1990, Sheridan stated that he had received a message from Goulding "calling [off] our deal." On April 24, 1990, Goulding appeared *pro se* in circuit court regarding the February 9, 1990, default order, and without giving notice to Lowrance, proved up damages in the amount of $77,615.95.

Nevertheless, even after April 24, 1990, without Goulding's yet notifying Lowrance of the entry of the default judgment, Browne and

Harbecke continued negotiations with Lowrance. As Browne testified at the section 2—1401 hearing, he and Harbecke were still holding out the possibility of settlement: they would "twist the arms of Mr. Goulding, if necessary."[2] By this time Browne had obtained CNA's check for $25,000, and forwarded it to Harbecke, who attempted to contact Sheridan on May 2, 1990, via facsimile, to arrange an exchange of payments. Harbecke indicated that Sheridan had until May 4, 1990, to tender Lowrance's $40,000. Sheridan, however, alleged that he did not receive the May 2 facsimile because he was ill and therefore out of the office until May 7, 1990, and when he returned to work on that day, he discovered that he had received a facsimile dated May 4, 1990, from Harbecke which stated that "all settlement [sic] is deemed to be null and void." Thereafter, Goulding refused to settle with Lowrance for less than $78,000, the approximate amount of the default judgment. It was not until May 29, 1990, however, that Harbecke returned to Sheridan, unsigned by Goulding and initially unsigned by Lowrance, the signature pages of the "Stipulations to Dismiss" which Sheridan had drafted; and it was not until June 1, 1990, more than 30 days after the fact, that Goulding notified Browne and Sheridan that a default judgment had been entered against Lowrance. Harbecke himself had been aware of the judgment since "sometime at the end of, very end of April."

On June 25, 1990, Lowrance filed a section 2—1401 (Ill. Rev. Stat. 1989, ch. 110, par. 2—1401) verified petition, claiming that he had been "duly diligent in the presentation of this petition insofar as he was given no notice of [the] entry [of the default judgment], and further that the fact of its entry was concealed from him until more than 30 days after its entry" and that he had good defenses thereto. Goulding filed his response on June 28, 1990, and after numerous intervening motions, the court heard testimony on July 17 and 24, 1990. After considering the briefs filed by the parties, as well as the evidence, the trial court denied the petition, but gave no reasons for its ruling. Lowrance filed a timely notice of appeal.

---

[2]There is evidence that Goulding's attorneys were acting at his command. In his May 2, 1990, facsimile to Sheridan, Harbecke stated that "[i]f *we* do not receive [the $25,000 check] by 5-4-90, *Mr. Goulding has directly [sic] me* that all prior deals are to be deemed null and void." (Emphasis added.) Likewise, in his May 4, 1990, facsimile to Sheridan, Harbecke stated, "my client, Randall S. Goulding has *directed me* to inform you that any and all settlement is deemed to be null and void. *** You should now act accordingly." (Emphasis added.)

## II

■■ *Smith v. Airoom, Inc.* (1986), 114 Ill. 2d 209, 220-21, instructs us that

> "[t]o be entitled to relief under section 2—1401, the petitioner must affirmatively set forth specific factual allegations supporting each of the following elements: (1) the existence of a meritorious defense or claim; (2) due diligence in presenting this defense or claim to the circuit court in the original action; and (3) due diligence in filing the section 2—1401 petition for relief. [Citations.]"

Moreover, "[t]he quantum of proof necessary to sustain a section 2—1401 petition is a preponderance of the evidence. [Citations.] [And w]hether *** [the] petition should be granted lies within the sound discretion of the circuit court, depending upon the facts and equities presented." *Airoom*, 114 Ill. 2d at 221.

## A

Lowrance contends that the trial court abused its discretion in denying him relief inasmuch as he has meritorious defenses to the underlying action. He states in his section 2—1401 petition that he was never an officer, shareholder or director of Ag-Re-Co, Inc., and thus is neither liable for the corporation's debt nor capable of being sued in the name of the corporation. Although Goulding brought his action against "Harry Lowrance d/b/a Ag-Re-Co, Inc.," as well as against Ag-Re-Co, Inc., the default judgment was obtained against Lowrance only.

■■■ A corporation is a legal entity, separate and distinct from its shareholders, officers and directors, and generally must be sued in its own name and not in the name of its shareholders, officers or directors. (*Stap v. Chicago Aces Tennis Team, Inc.* (1978), 63 Ill. App. 3d 23, 27.) It is possible, however, to disregard a corporate entity and impose liability upon those real parties in interest by using the equitable doctrine of "piercing the corporate veil." In order to "pierce the corporate veil" there must be (1) "unity of interest and ownership [such] that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances *** [such] that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." (*Stap*, 63 Ill. App. 3d at 27.) Goulding's complaint alleges that Lowrance controlled the corporation "through his nominees," *viz.*, his mother, who held 18% of the stock, and Zech, described as a "close personal friend," who held 48%. The complaint

also alleged that Lowrance's mother and Zech were the only persons who could sign the corporation's checks. Lowrance admits in his answer that he "controlled" Ag-Re-Co, Inc., during the times in question, without further explaining what such control consisted of. We must assume, therefore, that the trial judge entered judgment against Lowrance on the theory that his "control" of 66% of the shares in Ag-Re-Co subjected him to individual liability. There is no indication in the record that the judge was presented with anything more; in fact, the record appears to focus almost exclusively upon Lowrance's alleged lack of diligence in defending against Goulding's claim. We cannot accept Goulding's theory. Since our Business Corporation Act of 1983 (Ill. Rev. Stat. 1987, ch. 32, par. 1.01 *et seq.*) permits one person to form a corporation and to own all of its shares, it would be defeating the purpose of the legislature in enacting that statute to hold that control of a corporation through the mere ownership of its shares results in transmuting liability from the corporation to the individual who chooses the corporate form of doing business because it offers, among other advantages, insulation from individual liability.

So much for Goulding's breach of contract claim. The remaining two counts of his complaint were based on the same set of allegations, one count being based on an account stated and the other on *quantum meruit*, and judgment was rendered against Lowrance individually without any specification as to which of the counts the judgment applied. No matter, for Lowrance stated a meritorious defense sufficient to defeat Goulding's underlying action in its entirety and thus satisfied this part of his burden under section 2—1401.

## B

As to the second requirement for the granting of a section 2—1401 petition, Lowrance urges that he was diligent in presenting his meritorious defense to the circuit court in the original action. He alleges (1) that Goulding's representation to the trial court at the time of prove up, that " 'a settlement supposedly *** was never consummated,' " was "neither candid nor forthright, but evasive, misleading and false," and (2) that the entry of the default judgment "was attended by unfair and unconscionable circumstances," *i.e.*, by keeping knowledge of the existence of the judgment covert, by telling Sheridan that the judgment had been vacated, and by continuing with settlement talks when he had no intention of going through with it. He claims that these factors are the types of circumstances in which equity demands the granting of a section 2—1401 petition, even in the absence of due diligence. (See *Hunt v. General Improvements, Inc.*

(1977), 48 Ill. App. 3d 421, 423 ("justice and fairness may require that a judgment be vacated even though there may have been a lack of due diligence"); see also *Elfman v. Evanston Bus Co.* (1963), 27 Ill. 2d 609, 613; *Smith v. Airoom, Inc.* (1986), 114 Ill. 2d 209, 225.) Goulding claims that Lowrance was not duly diligent in presenting his defenses to the circuit court in the original action because of his numerous absences from hearings and failure to comply with court orders.

■ Even if Lowrance were not duly diligent in presenting his defenses to the circuit court, there are certain circumstances under which equity permits a relaxation of the due diligence standard. "While no duty is imposed upon a party or counsel to sue out an execution promptly in order to inform a defendant of a default within the thirty-day period, yet failure to do so is a circumstance which casts a cloud upon the entire proceeding. Ellman v. De Ruiter [(1952), 412 Ill. 285,] 293." (*Jansma Transport, Inc. v. Torino Baking Co.* (1960), 27 Ill. App. 2d 347, 354-55; see also *Genesis & Sons, Ltd. v. Theodosopoulos* (1991), 223 Ill. App. 3d 276.)

> "While the failure to give notice of, or to execute upon, a default judgment within 30 days of its entry may be a *factor* to be considered in determining whether the plaintiff has acted so unfairly as to justify relaxation of the due-diligence standard (*Elfman v. Evanston Bus Co.* (1963), 27 Ill. 2d 609, 614; [citations]), additional circumstances must exist which would compel the conclusion that the party obtaining the *ex parte* judgment would gain an unfair, unjust, or unconscionable advantage if the judgment were not vacated ([citations]; *Hunt v. General Improvements, Inc.* (1977), 48 Ill. App. 3d 421, 424-25; *Houston v. Churchill* (1968), 100 Ill. App. 2d 56, 60-61.)" (Emphasis in original.) (*Airoom*, 114 Ill. 2d at 227-28.)

It is also appropriate to excuse the due diligence requirement where the party obtaining the judgment fraudulently conceals it. "To establish fraudulent concealment, proof is required of 'something of an affirmative character' or 'trick or contrivance' calculated to prevent inquiry or suspicion by the defendant. [Citations.]" *Schmitz v. Hoffmann* (1978), 61 Ill. App. 3d 130, 132; see also *Genesis & Sons*, 223 Ill. App. 3d 276.

In essence, the conduct of the plaintiff must have been taken "to mislead or lull [the defendant] into believing the case was proceeding normally while in the meantime obtaining a default judgment." (*Airoom*, 114 Ill. 2d at 228.) Some of the factors which courts have considered as tending to "mislead or lull the defendant" and thus justify relaxation of the due diligence standard are as follows: (1) where

plaintiff failed to notify defendant of the default judgment even while he represented to him that he "would not be ready to talk settlement until after the first of the year," when a related, criminal matter would have been settled, which also would have been after the time in which the defendant could make a direct attack on the judgment (*Ellman v. De Ruiter* (1952), 412 Ill. 285); (2) where the original summons was not served on the defendant and plaintiff did not inform it of initiating the suit, even when both parties were codefendants in another pending suit and were in constant negotiations and conferences regarding that other suit (*Jansma Transport, Inc. v. Torino Baking Co.* (1960), 27 Ill. App. 2d 347); and (3) where at the unnoticed prove up plaintiff claimed damages unrelated to the defendant's liability, thus taking advantage of both the defendant and the trial court (*Elfman v. Evanston Bus Co.* (1963), 27 Ill. 2d 609).

One of the most recent cases dealing with this issue is *Genesis & Sons, Ltd. v. Theodosopoulos* (1991), 223 Ill. App. 3d 276, the facts of which were as follows: the plaintiff filed a complaint in small claims court seeking damages arising from an automobile accident he had with the defendant. The defendant sought a trial on the merits which was initially set for May 9, 1990, later continued to June 19, 1990, and finally set for trial on October 1, 1990. Through inadvertence, however, defense counsel's firm incorrectly docketed the trial date, causing her to fail to appear for the trial, and resulting in a default judgment being entered against her client. In his section 2—1401 petition, defendant averred that the plaintiff's attorney did not call defense counsel to determine if she would be present for trial or if there were any confusion regarding the trial date. The defendant also pointed out that the plaintiff's counsel notified neither his attorney's office nor the defendant of the default judgment, despite the fact that his attorney had had a telephone conversation regarding the case with the plaintiff's counsel during the week of November 10, 1990. The first awareness that defendant's attorney had of the default judgment was when the plaintiff's counsel gave notice to the defendant's insurance company more than 30 days after the entry of judgment.

Relying upon the equitable aspects of section 2—1401, the court stated that it "should prevent enforcement of a default judgment when it would be unfair, unjust or unconscionable," holding that "under the particular circumstances of this case *** the alleged breach of professional conduct is sufficient to constitute unconscionable conduct so that we may ease the due diligence requirement." (*Genesis & Sons*, 223 Ill. App. 3d at 280, 281.) The court noted that no explanation was given by the plaintiff's counsel for failing to investigate why, after de-

fense counsel had appeared at all other times, she had not appeared on the trial date. The court was also troubled by the fact that notice of the default was sent more than 30 days after the entry of the default judgment, and even then, was sent to the defendant's insurance company, a nonparty, concluding that it could not "condone such conduct by allowing a judgment achieved by such conduct to stand." *Genesis & Sons*, 223 Ill. App. 3d at 282.

■ Here, too, we cannot condone Goulding's conduct in obtaining a default judgment without notice and concealing its entry for more than 30 days; thus, we too, as did the court in *Genesis & Sons*, find it necessary to relax the applicable due diligence standards. Although the trial judge here gave no reasons for denying the section 2—1401 petition, the court in *Genesis & Sons* was not furnished with a transcript of the section 2—1401 proceedings or a statement of facts agreed to by the parties.

Sheridan maintains that Harbecke told him that the motion to vacate had been granted and that his client should have been able to rely on Harbecke's statement, despite the fact that it is the responsibility of the parties and their attorneys to check with the clerk of the court to follow the course of the case. (*Esczuk v. Chicago Transit Authority* (1968), 39 Ill. 2d 464, 468-69.) We note that in *Genesis & Sons*, the parties and attorneys also failed to keep abreast of the status of the case, relying on rudimentary concepts of professional courtesy, and where, accordingly, the court found the equities to be in favor of the party seeking section 2—1401 relief. It is important to note that Goulding failed to notify either Lowrance or his attorney of the prove up date; neither did he notify Lowrance, Sheridan, or even his own attorney, Browne, of entry of the default judgment until more than 30 days after the fact. Also telling is the fact that Goulding failed to return CNA's $25,000 check to Browne, and Lowrance's settlement papers to Sheridan, until more than 30 days after the entry of the default judgment. Indeed, at oral argument Goulding himself admitted that although he knew that Harbecke and Browne were continuing with settlement negotiations "even on May 2d, and on May 3d, and on May 4th," he deliberately permitted the 30-day period to go by without disclosing that the default judgment had been entered because he thought that trial courts are "very liberal" with regard to vacating default orders. The combination of these factors clearly suggests a calculated effort to lead Lowrance and Sheridan to believe that the motion to vacate had in fact been granted. Accordingly, these facts call for the result reached in *Ellman, Jansma* and *Genesis &*

*Sons,* in which equitable principles were held to require the easing of the due diligence standard, as we do here.

## C

██ Lastly, Lowrance contends that he was diligent in the filing of his section 2—1401 petition, in that "he was given no notice of [the] entry [of the default judgment], and further *** the fact of its entry was concealed from him until more than 30 days after its entry ***, and that since that time he has negotiated with Plaintiff's counsel and carrier in good faith to effect and proceed with the settlement previously made." Goulding relies upon the fact that Lowrance "waited nearly a full month before filing a 'Petition' pursuant to Section 2—1401. In addition, he did nothing for more than two months after the judgment was entered, and more than four and one-half (4½) months after the second default order was entered against Lowrance."

In *In re Marriage of Frazier* (1990), 203 Ill. App. 3d 847, 853, the court held that the husband was duly diligent in filing his petition even though he did not do so until nearly seven months after learning that the property which had been awarded to him in a divorce proceeding had been stolen from his former wife's home. On the facts of the case at bar, we hold that Lowrance was diligent enough in filing his petition 24 days after he had notice of the entry of the default judgment. Although he was aware of the entry of the default judgment, Lowrance attempted to "effect and proceed with the settlement previously made," during the 24 days which passed before he filed his section 2—1401 petition for relief. A 24-day delay in filing under other circumstances might not meet the due diligence standards, but here, because Goulding had been willing to "proceed with the settlement previously made" even after he had called off settlement negotiations, Lowrance was reasonably diligent in filing his section 2—1401 petition.

For the above-stated reasons, we hold that the trial court abused its discretion in denying Lowrance's section 2—1401 petition. We therefore reverse the judgment of the circuit court and remand this cause for further proceedings consistent with the views expressed herein.

Reversed and remanded.

DiVITO and McCORMICK, JJ., concur.